PeaesoN, J.
The broad question is, had the legislature power to authorise the company to build a bridge across the North East branch of the Cape Pear river, in eontvnication, and as a pa/td of the rail road — charging for persons and property carried along the road and making no charge for persons or property set over the river as an act of itself, i. e. (making no separate charge for setting persons or property over the river, and making no higher charge on that part of the road by reason of the river,) notwithstanding the franchise claimed by the plaintiff under the act of the Governor, Council, and Assembly of the colony of North Carolina, in the year 1766?
Admit that the act of 1766 is to be considered as a contract, -by which 'the Governor, Council and Assembly of the Colony on the one part, agree to and with Benjamin Herron on the other part,"that in consideration of the work and labor of the said Benjamin in building a bridge across the river, and keeping the same in repair, “ the benefit thereof should be vested in him, his heirs and assigns forever, ” and they should forever have the right to take certain toll from all persons and property passing over the bridge, and that it should not be lawful for any person whatever to ¡keep any ferry, build any bridge, or set any person or property over the river for fee or reward within six miles of the bridge, and for any violation of the rights of the said Benjamin, his heirs or assigns a penalty of twenty shillings proc. should be recoverable by them, &c.
The first question is, was the meaning of the parties, and of course, the scope and operation of the contract, confined to the ferries, bridges, and other modes of setting persons and property over the river at that time known and in use? Or, was *189 it the meaning of the parties, and was it in their contemplation to confer upon ITerron, his heirs and assigns, a perpetual monopoly of setting persons and property over the river by means of his bridge, so that it should never thereafter be in the power of the Governor, Council and Assembly, no matter what might be the change in the condition of things, either in reference to the increased necessity for transports across the river or the improved modes of transportation, to authorise any other mode of crossing the river?
We should hesitate long before bringing our minds to the conclusion that the latter is the true construction of the contract ; because it was unreasonable on the part of Herron, in consideration of the services that lie was to perform, to exact any such stipulation ; and because it was unreasonable on the part of the Governor, Council and Assembly in consideration of building a bridge, to confer a perpetual monopoly, and take from themselves and their successors, for all time to come, the power of doing that for which all governments are organised,' — -promoting the general welfare, by adopting such measures as a new condition-of things might make necessary and taking advantage of such improvements and inventions as after ages might originate, for the benefit of the public; in other words, it is unreasonable to suppose that they intended to surrender the means by which they and their successors might, thereafter, be enabled to effect the purpose for which thej^ wore created and formed into a government.
Suppose, for instance two cities had grown up, one on either side of the river, so that the necessities of the public should call for a dozen such bridges, or the progress of science had called for a tunnel under the river, or a line of balloons over the river, or a rail road car rushing by steam from one extremity of the continent to the other, across the river, was it the meaning of the parties that the government tied its own hands, and disabled itself, for all time to come, from doing its duty ? so as to exclude all idea of progress, in such-wise that the steam car must stop at the North East branch of the Cape Rear river, and all persons and property must be transported *190 over the bridge of Benjamin Herron, after the manner, and in the waj, such things were done in 1706 !! A construction of the contract leading to this conclusion, is against reason. The truth is, it is jnst as impossible that the Governor, Council and Assembly of the province of North Carolina, by the act of 1700, contemplated on their part, and that of their successors forever, a surrender of the power to incorporate a rail road company, as it is, that Benjamin Herron contemplated on his part, and that of his heirs and assigns forever, an obligation to carry over “ his bridge” a rail road car under the description of a “ wheeled carriage,” and that a passenger in the car was to be paid for, as a foot traveller, at the rate of “ four pence”!!
"We are not, however, under the necessity of putting the Decision upon the mere question of construction, for our declaration of rights, at once, puts an end to any such unreasonable pretension or claim to an hereditary WiHyoerpetual monopoly, as that set up by the plaintiff. “Declaration of Rights,” sec. 3, “ That no man, or set of men, are entitled to exclusive or separate emoluments or privileges from the community, but in consideration of public services.” Sec. 22, “That no hereditary emoluments, privileges, or honors, ought to be granted or conferred in this State.” Sec. 23, “ That perpetuities and monopolies are contrary to the genius of a free State and ought not to be allowed.”
By this solemn declaration “the people” who were then exercising the highest act of sovereignty — that of making a government for themselves, forbade the creation of monopolies and put an end to all such as then existed.
The meaning and purpose was to forbid and abolish all hereditary and perpetual monopolies as “ contrary to the genius of a free State,” and to put in motion the “new State” they were then organising, as a free representative repmhlioan government, relieved from all fetters and trammels previously existing by which its action might be cramped or circumscribed, and fully authorised to d‘o every thing necessary and proper to accomplish its mission, i. e. promote the general welfare.
*191 Wo are not now to decide whether the “franchise” or “ monopoly” granted to Herron, his heirs and assigns, by the colonial government, was entirely abolished by the declaration of rights and the formation of the State government or not. It may be that the franchise still exists, so far as it confers a right to keep up a bridge and take toll, and possibly so far as to prevent any other person from “ setting any person or thing over the river” in the way of a ferry or an ordinary bridge ; that is a different question: we decide now, that, notwithstanding the colonial act of 1JG6, the Legislature in 1833 had the power to grant to the defendants a right to construct a rail road, and in doing so, to cross the South East branch of Cape Rear, and to consider “ the transit” over the river as a part of the road.
As the act of 1706 imposes upon Ilerron, his heirs and assigns the duty of keeping up the bridge, it might be a question whether this was not a concurrent part of the contract, so. as to make it pecossary for the plaintiff to aver that his bridge was up, and in good repair at'the time the defendant was guilty of the wrong, &c., and that he was then and "there, ready and able, by means of his bridge, to carry all persons and things across the river. It would seem to be unreasonable, apart from what we have said above, that the plaintiff should have a right to stop the whole line of travel from north to south, unless he avers and is able to prove, that lie was prepared to set all persons over the river in reasonable time and with reasonable safety. Without this averment he would be allowed to take advantage of his own wrong— to recover twenty shillings for every person set over the river by any one else, whereas if he had done it himself the price was four penes!
In reply it is said by the act of 1Y66 the plaintiff is liable to the pains and penalties imposed by law, on other keepers of public bridges and ferries, if he failed “ to keep the same in good order and fit for passing over ”: This is true, but it would hardly be considered satisfactory by a traveller who is stopped at the bank of the river and finds that the plaintiff *192 is not prepared to set him over, and it is unlawful for any one else to do so.
Per CuRiAM. Judgment affirmed.