IN THE SUPREME COURT OF NORTH CAROLINA

No. 156A17-2

Filed 18 December 2020

CHRISTOPHER DICESARE, JAMES LITTLE, and DIANA STONE, individually and on behalf of all others similarly situated

v.

THE CHARLOTTE-MECKLENBURG HOSPITAL AUTUHORITY, d/b/a CAROLINAS HEALTHCARE SYSTEM

Appeal pursuant to N.C.G.S. § 7A-27(a)(3) and by writ of certiorari pursuant to N.C.G.S. § 7A-32(b) from an interlocutory order entered on 27 February 2019 by Special Superior Court Judge for Complex Business Cases Michael L. Robinson in Superior Court, Mecklenburg County, after the case was designated a mandatory complex business case by the Chief Justice pursuant to N.C.G.S. § 45.4(b). Heard in the Supreme Court on 16 June 2020.

*Elliott Morgan Parsonage, PLLC, by R. Michael Elliott; Lieff Cabraser Heimann & Bernstein, LLP, by Daniel Seitz, Adam Gitlin, and Brendan P. Glackin; Pearson Simon & Warshaw, LLP, by Alexander L. Simon and Benjamin E. Shiftan, for plaintiff-appellant Christopher DiCesare, et al.*

*Womble Bond Dickinson (US) LLP, by Russ Ferguson, James Cooney, III, Sarah Motley Stone, Debbie W. Harden, Matthew Tilley, Mark J. Horoschak, Bryan Hayles, and Michael P. Fischer; Boies Schiller & Flexner, LLP, by Hampton Y. Dellinger, Richard A. Feinstein, and Nicholas Widnell, for defendant-appellee The Charlotte-Mecklenburg Hospital Authority d/b/a Carolinas Healthcare System.*

*Attorney General Joshua H. Stein, by Deputy Solicitor General James W. Doggett, Special Deputy Attorneys General K.D. Sturgis Daniel P. Mosteller, and Assistant Attorney General Daniel T. Wilkes, for amicus State of North Carolina.*

*N.C. Department of State Treasurer, by Sam M. Hayes and Kendall M. Bourdon, for amicus N.C. State Health Plan.*

ERVIN, Justice.

This case involves a dispute between plaintiffs, a group of current and former North Carolina residents who are covered under commercial health insurance obtained through an employer with fifty-one or more employees, and the Charlotte-Mecklenburg Hospital Authority, a non-profit corporation providing healthcare services with a principal place of business in Charlotte, in which plaintiffs seek reimbursement for healthcare costs based upon claims for restraint of trade and monopolization pursuant to Chapter 75 of the North Carolina General Statutes and Article I, Section 34 of the North Carolina Constitution. As will be discussed in greater detail below, this case requires us to determine whether the trial court correctly decided issues arising from the Hospital Authority's motion for judgment on the pleadings relating to the claims asserted in plaintiffs' third amended complaint. After careful consideration of the parties' challenges to the trial court's order in light of the allegations contained in the third amended complaint, we conclude that the challenged trial court order should be affirmed, in part, and reversed, in part.

## I. Factual Background

### A. Substantive Facts

The Hospital Authority was established in 1943 pursuant to the North Carolina Hospital Authorities Act,[1] N.C.G.S. §§ 131E-15 *et seq.*, and is jointly chartered by Mecklenburg County and the City of Charlotte.  The Act states that "[t]he General Assembly finds and declares that in order to protect the public health, safety, and welfare, including that of low income persons, it is necessary that counties and cities be authorized to provide adequate hospital, medical, and health care and that the provision of such care is a public purpose."  N.C.G.S. § 131E-1(b) (2019).  The Act is intended "to provide an alternate method for counties and cities to provide hospital, medical, and health care," *id*, and defines a hospital authority as "a public body and a body corporate and politic organized under the provisions of [the Act]."  N.C.G.S. § 131E-16(14).  The Hospital Authority is governed by a Board of Commissioners, whose members are appointed by the mayor or chairman of the county commission.  N.C.G.S. § 131E-17(b).

The Hospital Authority provides, among other things, a suite of general acute care inpatient hospital services, including a broad range of medical and surgical diagnostic and treatment services, to individuals insured under group, fully-insured, and self-funded healthcare plans.  The Hospital Authority has a large general acute-

---

[1] The Hospital Authorities Act was initially known as the Hospital Authorities Law and was formerly codified at N.C.G.S. § 131-90 to -116 (1943).

care hospital located in downtown Charlotte and nine other general acute-care hospitals in the Charlotte area. There are at least two other inpatient hospitals or multi-hospital systems operating within the Charlotte area: Novant, which operates five inpatient hospitals in the Charlotte area, and CaroMont Regional Medical Center.

In 2013, the Hospital Authority began including restrictions in its contracts with the four insurers which provide coverage to more than eighty-five percent of the commercially-insured residents of the Charlotte area, with the effect of these restrictions being to prohibit the insurers from "steering" their insureds to lower cost providers of medical care services and to forbid the insurers from allowing the Hospital Authority's competitors to place similar restrictions in their contracts with the insurers.

## B. Procedural History

On 9 September 2016, plaintiff Christopher DiCesare filed a complaint "individually and on behalf of a class of similarly situated individuals"[2] in Superior Court, Mecklenburg County, which he amended on three occasions for the primary purpose of adding additional parties plaintiff.[3] In their third amended complaint,

---

[2] Although plaintiffs seek to represent a state-wide class in this lawsuit pursuant to Rule 23 of the North Carolina Rules of Civil Procedure, the trial court had not ruled on this request at the time it entered the orders which serve as the basis of this appeal.

[3] On 14 October 2016, Mr. DiCesare filed a first amended complaint to add James Little and Johanna MacArthur as named plaintiffs. On 20 November 2017, plaintiffs filed a second amended complaint reflecting the fact that Mr. DiCesare had moved and was no longer a resident of North Carolina. On 21 May 2018, Ms. MacArthur voluntarily dismissed

plaintiffs asserted claims against the Hospital Authority for: (1) restraint of trade pursuant to N.C.G.S. § 75-1 (2019) (providing that "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the State of North Carolina is hereby declared to be illegal") and N.C.G.S. § 75-2 (providing that "[a]ny act, contract, combination in the form of trust, or conspiracy in restraint of trade or commerce which violates the principles of the common law is hereby declared to be in violation of [N.C.G.S. §] 75-1") and (2) monopolization in violation of N.C. Const. art. I, § 34 (providing that "monopolies are contrary to the genius of a free state and shall not be allowed"), N.C.G.S. § 75-1.1 (providing that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful"), N.C.G.S. § 75-2, and N.C.G.S. § 75-2.1 (providing that "[i]t is unlawful for any person to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of trade or commerce in the State of North Carolina"). In support of these claims, plaintiffs alleged that the Hospital Authority is "the dominant hospital system in the Charlotte area, with approximately a fifty percent share of the relevant market"; that the Hospital Authority had "leveraged its market power to . . . increase [its] billing rates"; and that its two largest competitors in the area—Novant and CaroMont Regional Medical Center—had "less than half" and "less

---

her claims against the Hospital Authority. On 8 August 2018, plaintiffs filed a third amended complaint adding Diana Stone and Kenneth Fries as named plaintiffs.

than one tenth" of the Hospital Authority's annual revenue, respectively. According to plaintiffs, the Hospital Authority's market power allowed it "to profitably charge prices to insurers that are higher than competitive levels across a range of services, and to impose on insurers restrictions that reduce competition"; "to negotiate high prices (in the form of high 'reimbursement rates') for treating insured patients"; and to "demand[ ] reimbursement rates that are up to 150 percent more than other hospitals in the Charlotte area for providing the same services." Plaintiffs further alleged that "[the Hospital Authority] encourages insurers to steer patients toward itself by offering health insurers modest concessions on its market-power driven, premium prices" while "forbid[ding] insurers from allowing [the Hospital Authority's] competitors to do the same." In plaintiffs' view, the Hospital Authority's alleged conduct "prevent[s] [the Hospital Authority's] competitors from attracting more patients through lower prices," providing its competitors with a "less[ened] incentive to remain lower priced and to continue to become more efficient" and "reduc[ing]" the amount of competition faced by the Hospital Authority.

In light of these allegations, plaintiffs claimed that the steering restrictions contained in the Hospital Authority's contracts with insurers resulted in an unlawful restraint of trade and monopolization on the grounds that "these steering restrictions have had, and will likely continue to have, . . . substantial anticompetitive effects in the relevant product and geographic market," including: (1) "protecting [the Hospital Authority's] market power and enabling [the Hospital Authority] to charge

supracompetitive prices that increase payments for deductibles, copayments and insurance premiums"; (2) "substantially lessening competition among providers of acute inpatient hospital services"; (3) "restricting the introduction of innovative insurance products that are designed to achieve lower prices and improved quality for acute inpatient hospital services"; (4) "reducing consumers' incentives to seek acute inpatient hospital services from more cost-effective providers"; and (5) "depriving insurers and their enrollees of the benefits of a competitive market for their purchase of acute inpatient hospital services." In addition, plaintiffs claimed that "[e]ntry or expansion by other hospitals in the Charlotte area has not counteracted the actual and likely competitive harms resulting from" the steering restrictions; that any future "entry or expansion is unlikely to be rapid enough and sufficient in scope and scale to counteract these harms to competition"; and that "[the Hospital Authority] did not devise its strategy of using steering restrictions for any procompetitive purpose," "[n]or do the steering restrictions have any procompetitive effects," so that "[a]ny arguable benefits of [the Hospital Authority's] steering restrictions are outweighed by their actual and likely anticompetitive effects."

On 14 August 2018, the Hospital Authority filed an answer to plaintiffs' third amended complaint in which it denied the material allegations set forth in plaintiffs' third amended complaint and asserted various affirmative defenses. On the same date, the Hospital Authority filed a motion seeking judgment on the pleadings in its favor pursuant to N.C.G.S. § 1A-1, Rule 12(c), on the grounds that (1) "quasi-

municipal corporations such as the Hospital Authority are not subject to claims under Chapter 75" in accordance with the Court of Appeals' decision in *Badin Shores Resort Owners Ass'n, Inc. v. Handy*, 257 N.C. App. 542, 560, 811 S.E.2d 198, 210 (2018) (holding that, "as a quasi-municipal corporation," a sanitary district "cannot be sued for unfair and deceptive trade practices" pursuant to Chapter 75), and "[Chapter 75] therefore does not apply to the Hospital Authority"; and that (2) "[p]laintiffs [had] failed to allege facts sufficient to state a claim for violation of . . . [N.C. Const. art. I, § 34], and, indeed, [had] alleged facts that affirmatively defeat such a claim."

On 27 February 2019, the trial court entered an order in which it granted the Hospital Authority's motion for judgment on the pleadings with respect to plaintiffs' restraint of trade and monopolization claims to the extent that those claims were predicated upon alleged violations of Chapter 75, given that: (1) "our legislature intended that hospital authorities organized under the [Hospital Authorities] Act were to be treated as quasi-governmental entities," so that, "consistent with *Badin Shores*, . . . [the Hospital Authority] is . . . exempt from liability pursuant to the provisions of Chapter 75" and that (2) our decision in *Madison Cablevision, Inc. v. City of Morganton*, 325 N.C. 634, 386 S.E.2d 200 (1989) (holding that, where the General Assembly had "specifically authorized [cities] . . . to own and operate cable systems and to prohibit others from doing so without a franchise" and where the General Assembly had not "required [the municipalities] to issue franchises," "the legislature cannot be presumed to have intended that conduct so clearly authorized

could give rise to state antitrust liability"), "[did] not control the [trial court's] analysis" in this case, given the trial court's "belie[f] that *Madison Cablevision*, properly interpreted, stands for the limited proposition that, where the legislature has contemplated or authorized conduct that could be considered anticompetitive, the legislature did not intend those acting pursuant to their authorization to simultaneously be subject to potential liability under Chapter 75," despite the absence of any "indicat[ion] that [the Hospital Authority] was explicitly authorized . . . to include these restrictions in its contracts with insurers."  On the other hand, the trial court denied the Hospital Authority's motion seeking judgment on the pleadings with respect to plaintiffs' monopolization claim given that N.C. Const. art. I, § 34, "covers [the Hospital Authority] as a quasi-municipal corporation" and given that plaintiffs had alleged that there are other small competitors in the Charlotte area, that the Hospital Authority's "sheer size gives it excessive market power to negotiate contracts with health insurers that restrain competition," and that services outside of the Charlotte area are not a reasonable substitute for equivalent services within the Charlotte area, with such allegations serving to demonstrate that competition had been "stifled" or that freedom of commerce had been "restricted" to such an extent as to state a monopolization claim pursuant to N.C. Const. art. I, § 34, and with the facts of this case being distinguishable from those at issue in *American Motors Sales*, 311 N.C. 311, 317 S.E.2d 351 (1984) (holding that a statute which enabled the Commissioner of Motor Vehicles to prohibit a manufacturer from

granting more than one Jeep dealership within a specific county did not violate N.C. Const. art. I, § 34, given that the Commissioner's actions had lessened, but not "stifle[d]," competition), a case which the trial court did "not read . . . as requiring a plaintiff to plead that all competition has been eliminated." On 28 March 2019, plaintiffs noted an appeal to this Court from the trial court's order, which the trial court had certified for immediate review pursuant to N.C.G.S. § 1A-1, Rule 54(b). On 1 July 2019, the Hospital Authority filed a petition seeking the issuance of a writ of certiorari requesting that we review the trial court's order denying the Hospital Authority's motion for judgment on the pleadings with respect to plaintiffs' monopolization claim. On 30 October 2019, this Court allowed the Hospital Authority's certiorari petition.

## II. Substantive Legal Analysis

## A. Standard of Review

The purpose of N.C.G.S. § 1A-1, Rule 12(c) "is to dispose of baseless claims or defenses when the formal pleadings reveal their lack of merit" and is appropriately employed where "all the material allegations of fact are admitted in the pleadings and only questions of law remain." *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974). In deciding a motion for judgment on the pleadings, "[t]he trial court is required to view the facts and permissible inferences in the light most favorable to the nonmoving party," with "[a]ll well pleaded factual allegations in the nonmoving party's pleadings [being] taken as true and all contravening assertions in

the movant's pleadings [being] taken as false." *Id.* A party seeking judgment on the pleadings must show that "the complaint . . . fails to allege facts sufficient to state a cause of action or admits facts which constitute a complete legal bar thereto." *Van Every v. Van Every*, 265 N.C. 506, 510, 144 S.E.2d 603, 606 (1965). According to well-established North Carolina law, we review the trial court's rulings granting or denying motions for judgment on the pleadings *de novo.* *Old Republic Nat'l Title Ins. Co. v. Hartford Fire Ins. Co.*, 369 N.C. 500, 507, 797 S.E.2d 264, 269 (2017) (citing *CommScope Credit Union v. Butler & Burke, LLP*, 369 N.C. 48, 51, 790 S.E.2d 657, 659 (2016)).

## B. Chapter 75 Claims

In seeking relief from the challenged trial court order, plaintiffs contend that the trial court erred by granting the Hospital Authority's motion for judgment on the pleadings with respect to its claims pursuant to Chapter 75 for essentially three reasons. First, plaintiffs assert that our decision in *Madison Cablevision* requires that the trial court's decision with respect to the applicability of Chapter 75 be reversed. In plaintiffs' view, *Madison Cablevision* "did not grant [the city] blanket immunity from antitrust liability under Chapter 75 because it was a municipality"; "[r]ather, the Court analyzed the entire statutory scheme governing cable television and found that antitrust liability did not lie because the legislature had authorized the challenged conduct and clearly contemplated that such conduct could displace competition." In addition, plaintiffs assert that *Madison Cablevision* recognized the

validity of "the analogy between exempting a city's conduct from [C]hapter 75 . . . and exempting certain municipal conduct under the 'state action' exemption of the Sherman Act,"[4] quoting *id.* at 656, 386 S.E.2d at 213, and ultimately concluded that, while "municipalities do not automatically enjoy immunity under the state action exemption," quoting *Madison Cablevision*, 325 N.C. at 656–57, 386 S.E.2d at 213, "[w]here the legislature has authorized a city to act, it is free to carry out *that act* without fear that it will later be held liable under state antitrust laws for doing *the very act* contemplated and authorized by the legislature," quoting *id.* at 657, 386 S.E.2d at 213 (emphasis added).

According to plaintiffs, "[r]ather than apply[ing] [the] straightforward analysis" set forth in *Madison Cablevision*, the trial court erroneously found that that decision was not controlling given that "the Hospital Authorities Act does not indicate that [the Hospital Authority] was explicitly authorized by the legislature to include these [anti-steering] restrictions in its contracts with insurers." Plaintiffs contend that "[i]t is precisely because the Hospital Authorities Act does not authorize the anticompetitive conduct alleged here that the *Madison Cablevision* standard" has not been met in this case, so that "[the Hospital Authority] cannot claim immunity from

---

[4] The Sherman Antitrust Act was enacted by Congress in 1890 and prohibits "contract[s] . . . in restraint of trade or commerce among the several States," 15 U.S.C. § 1, and "monopoliz[ing], or attempt[s] to monopolize, . . . any part of the trade or commerce among the several States," 15 U.S.C. § 2. In 1914, the Sherman Act was modified by the Clayton Antitrust Act, which, in pertinent part, provides for the awarding of treble damages to "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 17.

antitrust suit under Chapter 75." Plaintiffs claim that "the [trial] court's reading of *Madison Cablevision* turns this Court's decision on its head and effectively renders it a nullity," arguing that, "if cities, towns, and quasi-municipal corporations have blanket immunity from all claims under Chapter 75, this Court's statutory and policy-based analysis in *Madison Cablevision* was superfluous" given that "there is no mention in *Madison Cablevision*, even in *dicta*, that an entity other than the State could receive the blanket immunity from antitrust claims under Chapter 75 that [the Hospital Authority] seeks here."

Secondly, plaintiffs suggest that the state action immunity doctrine—which they describe as providing "immun[ity] from antitrust liability only if a court finds that the legislature intended to displace or restrain competition as a matter of state policy, and actively supervised that policy," citing *Parker v. Brown*, 317 U.S. 341, 63 S. Ct. 307, 87 L. Ed. 315 (1943)—should apply here and that the Hospital Authority is not entitled to claim immunity under the state action doctrine. Plaintiffs suggest that "there is considerable confusion among the lower courts regarding the proper lens through which to consider municipal and quasi-municipal corporations' liability for state antitrust violations" and that "[this] Court can settle the law on this issue by formally adopting the federal state action immunity doctrine, as it has twice indicated it might do." Plaintiffs assert that "this Court explained in *Rose v. Vulcan Materials Co.*, [282 N.C. 643, 194 S.E.2d 521 (1973)] [that] Chapter 75 is based on the federal Sherman Act" and that "the body of law applying the Sherman Act, although

not binding upon this Court, . . . is nonetheless instructive in determining the full reach of the statute," quoting *id*. at 655, 194 S.E.2d at 530, and citing *Johnson v. Phoenix Mutual Life Insurance Co.*, 300 N.C. 247, 262, 266 S.E.2d 610, 620 (1980) (stating that "it is appropriate for us to look to the federal decisions interpreting the [Federal Trade Commission] Act for guidance in construing the meaning of [N.C.G.S. §] 75-1.1").  More specifically, plaintiffs point out that "[N.C.G.S. §§] 75-1 and 75-2 mirror section 1 and section 2 of the Sherman Act, outlawing unreasonable restraints of trade and monopolization, respectively"; that "[N.C.G.S. §] 75-16 . . . offer[s] a treble damages remedy" just like its federal counterpart, the Clayton Act; and that [N.C.G.S. §] 75-1.1 "prohibit[s] . . . unfair and deceptive trade practices" and is, for that reason, comparable to the Federal Trade Commission Act of 1914.  In addition, plaintiffs suggest that the Court of Appeals has previously utilized federal case law in construing Chapter 75, *see Hyde v. Abbott Laboratories, Inc.*, 123 N.C. App. 572, 578, 473 S.E.2d 680, 684 (1996) (stating that "[f]ederal case law interpretations of the federal antitrust laws are persuasive authority in construing our own antitrust statutes"), and state that "[t]his Court [and the Court of Appeals have] previously adopted federal antitrust doctrines . . . that benefit defendants like [the Hospital Authority] by immunizing certain forms of conduct from liability," citing *N.C. Steel, Inc. v. National Council on Compensation Insurance*, 347 N.C. 627, 632, 496 S.E.2d 369, 372 (adopting the federal filed rate doctrine), and *Good Hope Hospital, Inc. v. N.C. Department of Health & Human Services*, 174 N.C. App. 266, 275–78, 620 S.E.2d

873, 881–82 (2005) (adopting the federal *Noerr-Pennington* doctrine)  Moreover, plaintiffs assert that we stated in *Madison Cablevision*, 325 N.C. at 657, 386 S.E.2d at 213, that our decision in that case was "fortified" by the reasoning of the United States Supreme Court in *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S. Ct. 1713, 85 L. Ed. 2d 24 (1985), and that we "employed an analysis fully consistent with federal jurisprudence."

Plaintiffs emphasize that "[t]he federal state-action immunity doctrine is the product of seven decades of jurisprudence," beginning with *Parker*; that "[i]t is the best rubric available for understanding the circumstances under which government-related actors may and may not be liable under the antitrust laws"; and that "the doctrine grants immunity from suit under the Sherman Act to substate governmental entities like municipalities and hospital authorities *only if* the legislature intended to replace competition with regulation," with the ultimate goal of "seek[ing] to strike the appropriate balance between a State's sovereign ability to govern in ways that may run afoul of the antitrust laws without *ipso facto* immunizing actions that may not truly be those of the [S]tate," citing *Federal Trade Commission v. Ticor,* 504 U.S. 621, 112 S. Ct. 2169, 119 L. Ed. 2d 410 (1992).  Plaintiffs also point to *Federal Trade Commission v. Phoebe Putney Health System, Inc.*, 568 U.S. 216, 133 S. Ct. 1003, 185 L. Ed. 2d 43 (2013), in which the Supreme Court determined that, while a Georgia statute authorized hospital authorities to acquire additional facilities, that statute "[did] not clearly articulate and affirmatively express a state policy empowering [the

defendant] to make acquisitions of existing hospitals that [would] substantially lessen competition" and, for that reason, reversed a judgment upholding the defendant's claim of state action immunity. *Id.* at 228, 133 S. Ct. at 1012, 185 L. Ed. 2d at 56. In light of the Supreme Court's conclusion that, "when a State's position 'is one of mere neutrality respecting the municipal actions challenged as anticompetitive,' the State cannot be said to have 'contemplated' those anticompetitive actions," *id.* at 228, 133 S. Ct. at 1012, 185 L. Ed. 2d at 55, quoting *Community Communications Co., Inc. v. City of Boulder*, 455 U.S. 40, 55, 102 S. Ct. 835, 843, 70 L. Ed. 2d 810, 821 (1982), it is not sufficient, for purposes of a claim of state-action immunity, to show that the hospital authority was merely authorized to act; instead, the hospital authority must have been authorized to act in an anticompetitive manner in order to enjoy state-action immunity.

Plaintiffs argue that there is "no evidence" that the General Assembly has authorized the Hospital Authority "to employ anti-steering provisions that substantially lessen competition for hospital services or in any way even contemplated that such conduct would be a likely result of [the Hospital Authority's] delegation of authority by the Hospital Authorities Act." Instead, plaintiffs suggest that "this case demonstrates the dangers of extending immunity to a nominally public but largely unsupervised entity like [the Hospital Authority]" given its "clear institutional interest in deterring competitors or mechanisms that might effectively serve to lower prices for its services." According to plaintiffs, "[w]ithout adoption of

the state action doctrine, entities like [the Hospital Authority] will claim the right to flout the . . . State's antitrust law with impunity, and lower courts will struggle to reconcile the case law in assessing the anticompetitive conduct of any actor that is not strictly 'private.'" In plaintiffs' view, the fact that the Hospital Authority is a nonprofit corporation is of no moment given that nonprofit hospitals "seek to maximize their revenues and reimbursement rates just like their for-profit counterparts," citing *Federal Trade Commission v. University Health, Inc.*, 938 F.2d 1206, 1213–14 (11th Cir. 1991) (stating that the "assumption that University Hospital, as a nonprofit entity, would not act anticompetitively was improper"), and *Federal Trade Commission v. OSF Healthcare System*, 852 F. Supp. 2d 1069, 1081 (N.D. Ill. 2012) (stating that "the evidence in this case reflects that nonprofit hospitals do seek to maximize the reimbursement rates they receive"), and that "[t]he adoption of the nonprofit form does not change human nature," quoting *Hospital Corp. of America v. Federal Trade Commission*, 807 F.2d 1381, 1390 (7th Cir. 1986) (citations omitted). Finally, plaintiffs note that "by preserving the functional approach articulated in *Madison Cablevision*, modeled on the state action doctrine, this Court would not merely align North Carolina with the federal jurisprudence; it would also join the majority of its sister states that have considered the issue," noting that eight states have judicially adopted the federal state action doctrine "outright"; fourteen states have laws that "expressly adopt federal antitrust exemptions or that immunize conduct either required by state law or taken under the express authorization of state

law, to the extent of that authorization"; "[two] states [have] reject[ed] special immunity for state actors altogether"; and "[o]nly six states have more broadly limited the application of antitrust laws in the case of the state and municipalities," with "none of th[o]se decisions or statutes support[ing] extending blanket immunity by judicial fiat to a multi-billion dollar enterprise like [the Hospital Authority], accused of violating the North Carolina antitrust laws in ways not intended or foreseen by the legislature." According to plaintiffs, "[i]f this Court abandoned *Madison Cablevision* and granted [the Hospital Authority] the sweeping immunity it seeks, North Carolina would truly stand alone."

Thirdly, plaintiffs contend that *Badin Shores* was wrongly decided, that "*Badin Shores* must give way to *Madison Cablevision* in the antitrust context" given that "*Badin Shores* is at the very least inapplicable to antitrust claims," and that we should "leav[e] for another day the question of whether *Badin Shores* survives in the unfair and deceptive trade practices context in which it originated." In plaintiffs' view, "*Badin Shores* represents the ultimate conclusion of a muddled body of Court of Appeals case law."

As support for this assertion, plaintiffs point to *Sperry Corp. v. Patterson*, 73 N.C. App. 123, 325 S.E.2d 642 (1985), in which the Court of Appeals held that, regardless of whether sovereign immunity existed, the Secretary of the North Carolina Department of Administration was exempt from suit in light of the fact that Chapter 75 only applies to actions by and against a "person, firm, or corporation,"

with the State not falling within any of those categories. *Id*. at 125, 325 S.E.2d at 644–45. Plaintiffs further assert that, in *F. Ray Moore Oil Co. v. State*, 80 N.C. App. 139, 142–43, 341 S.E.2d 371, 374 (1986), the Court of Appeals held that the State could bring an unfair trade practices claim pursuant to Chapter 75 as a consumer against its fuel oil supplier on the grounds that the State was "engaged in business," and was acting in the same capacity as it had been acting in *Sperry*. Plaintiffs next direct our attention to the Court of Appeals' decisions in *Rea Construction Co. v. City of Charlotte*, 121 N.C. App. 369, 370, 465 S.E.2d 342, 343 (1996), and *Stephenson v. Town of Garner*, 136 N.C. App. 444, 448, 524 S.E.2d 608, 612 (2000), stating that "the Court of Appeals summarily extended the *Sperry* exemption to incorporated cities and towns in unfair trade practices cases" without "examin[ing] the language of Chapter 75" or "even mention[ing] *Madison Cablevision*, . . . from which [these] holdings deviated," and failed to "incorporate[ ] the *F. Ray Moore Oil* exemption for activities by state actor[s] engaged in business" (citation omitted). In addition, in *Badin Shores*, plaintiffs contend that the Court of Appeals erroneously determined that, since "[sanitary] districts have been defined as quasi-municipal corporations" and since Chapter 75 did not create a cause of action against the State, a sanitary district "cannot be sued for unfair and deceptive trade practices" "regardless of whether a sanitary district is entitled to sovereign immunity." 257 N.C. App. at 560, 811 S.E.2d at 210. According to plaintiffs, "the Court of Appeals failed to incorporate the limitation to the exemption imposed by *F. Ray Moore Oil Co.*, that a governmental

entity can sue . . . under Chapter 75 if it is engaged in business" (quotation omitted), citing *F. Ray Moore Oil Co.*, 80 N.C. App. at 142, 341 S.E.2d at 374. Finally, plaintiffs contend that there are "significant differences between the statutes establishing hospital authorities and sanitary districts," including that sanitary districts—but not hospital authorities—possess or exercise powers: (1) "which pertain exclusively to a government"; (2) "to levy property taxes"; (3) to "make rules for the public—enforceable as Class 1 misdemeanors and via injunction"; (4) to "require its residents to use its services" given that it has "no competitors"; and (5) to "establish a fire department—another core function of government."

In plaintiffs' view, "[t]he dramatic extension of *Sperry* ultimately worked in *Badin Shores* cannot stand as a matter of statutory interpretation." Plaintiffs argue that, since N.C.G.S. § 75-16 expressly states that a "person, firm, or corporation" can sue and be sued pursuant to Chapter 75, the fact that the Hospital Authority "claims to be a quasi-municipal 'corporation' " demonstrates that it falls within the ambit of Chapter 75. Moreover, plaintiffs note that N.C.G.S. § 12-3(6) "broadly define[s] 'person' " as encompassing "bodies politic and corporate, as well as . . . individuals, unless the context clearly shows to the contrary," quoting N.C.G.S. § 12-3(6). In light of their belief that "[t]he heart of [the Hospital Authority's] argument—and central to the [trial court's] decision—is that as a 'body corporate and politic' it qualifies as a public entity and 'quasi-municipal corporation,' " plaintiffs assert that the fact that N.C.G.S. § 12-3(6) defines "person" to include "bodies politic and corporate" ensures

that the Hospital Authority "is therefore plainly a 'person'" for purposes of Chapter 75. Plaintiffs contend that this interpretation is "mandated" by our decision in *Jackson v. Housing Authority of City of High Point*, 316 N.C. 259, 341 S.E.2d 523 (1986), in which, according to plaintiffs, we "dutifully read [N.C.G.S. §] 12-3(6)'s definition of 'person,' and its inclusion of 'bodies politic,' into the wrongful death statute." For that reason, plaintiffs reason that "surely a *quasi*-municipal corporation, even further removed from the auspices of state action, may be sued under [N.C.G.S. §] 75-16, when the legislature has provided no limitation on its applicability to hospital authorities, or for that matter any bodies politic." In the event that the General Assembly had intended to limit the scope of the term "person" so as to exclude entities like the Hospital Authority, plaintiffs assert that it could have provided such a limitation in the statute, but chose not to.

Furthermore, plaintiffs note that "the General Assembly intended Chapter 75 'to establish an effective private cause of action for aggrieved consumers in this State,'" quoting *Marshall v. Miller*, 302 N.C. 539, 543, 276 S.E. 2d 397, 400 (1981), and that the Court of Appeals upheld this principle in *Hyde*, 123 N.C. App. at 578, 473 S.E.2d at 684 (stating that "the General Assembly intended to provide a recovery for all consumers" in Chapter 75). Plaintiffs claim that "[a] blanket exemption from antitrust suit under Chapter 75 for all quasi-municipal corporations regardless of their legislative grant of authority or role in the marketplace does not effectuate the Legislature's intent for Chapter 75 to provide a broad-based recovery by all aggrieved

consumers," particularly given that "it cannot be seriously disputed that, regardless of its government affiliation, [the Hospital Authority] is a market participant 'engaged in [the] business' of selling hospital services." Plaintiffs further argue that, "[i]f this Court chooses not to overrule *Badin Shores*, at a minimum it should correct the Court of Appeals' omission of the 'engaged in business' exception articulated in *F. Ray Moore Oil*" given that "[t]here is no reason that the State should be liable when 'engaged in business' whereas multi-billion dollar entities like [the Hospital Authority] should not be." As a result, for all of these reasons, plaintiffs request that we overturn the trial court's decision to dismiss its claims pursuant to Chapter 75; that we "curb the uncertainty that has arisen among the lower courts in this area of the law by officially adopting the state-action immunity doctrine"; and that we "correct the legal error" contained within the Court of Appeals' holding in *Badin Shores*.

The Hospital Authority responds, as an initial matter, by contending that *Badin Shores* applies to plaintiffs' Chapter 75 claims and that it was correctly decided.[5] The Hospital Authority begins by arguing that it "shares the same *material legal characteristics* as the sanitary district in *Badin Shores*" given that both sanitary districts and the Hospital Authority (1) "are created pursuant to state statutes by

---

[5] In addition, the Hospital Authority points out that it is a quasi-municipal corporation and a "body corporate and politic," citing the Hospital Authorities Act, N.C.G.S. § 131E-16, *et seq*. In light of the fact that plaintiffs do not appear to contest that the Hospital Authority is a quasi-municipal corporation or a "body corporate and politic," we refrain from discussing the Hospital Authority's arguments with respect to this issue in greater detail.

acts of local government"; (2) "are governed by boards appointed by elected, government officials"; (3) "are authorized to issue municipal bonds and notes under the Local Government Finance Act"; (4) "are subject to North Carolina's Public Records Law"; (5) "are subject to North Carolina's Open Meetings Law"; (6) "are subject to regulation by the Local Government Commission"; and (7) "have the power . . . of eminent domain." In light of these similarities, the Hospital Authority contends that the trial court properly applied *Badin Shores* to this case.

Moreover, the Hospital Authority argues that "[t]he Court of Appeals' decision in *Badin Shores* merely represents the logical application of *Sperry*, *F. Ray Moore Oil*, *Rea*, and *Stephenson*." The Hospital Authority notes that the Court of Appeals held in *Sperry* that "[t]he consumer protection *and antitrust* laws of Chapter 75 of the General Statutes do not create a cause of action against the State, regardless of whether sovereign immunity may exist," *Sperry*, 73 N.C. App. at 125, 325 S.E.2d at 644 (emphasis added), and that neither the State nor an individual "act[ing] as a representative of the State when dealing with [a] plaintiff" may be sued pursuant to Chapter 75, *id.* at 125, 325 S.E.2d at 645. In the Hospital Authority's opinion, the Court of Appeals decision in *F. Ray Moore Oil Co.* merely "confirmed" that the Court's "interpretation of [N.C.G.S. §] 75-16 did not rest solely on [the] phrase 'person, firm, or corporation,' but instead on a broader understanding of Chapter 75's purpose and intent," which is the understanding that N.C.G.S. § 75-16 was "aimed at unfair and deceptive practice by those engaged in business for profit," quoting *F. Ray Moore Oil*

*Co.*, 80 N.C. App. at 142–43, 341 S.E.2d at 374. In view of the fact that "the State did not engage in 'business for profit,' " the Hospital Authority argues that the Court of Appeals' ultimate conclusion that "Chapter 75 was not intended to apply to governmental entities" "was consistent with [the] broader purpose" of Chapter 75.

The Hospital Authority asserts that the Court of Appeals relied upon such an understanding, in addition to the "language, history, and context" of N.C.G.S. § 75-16, in concluding in its subsequent decisions that, "[a]s creatures of the State," cities and towns are also "exempt from the reach of Chapter 75." *See Rea Construction*, 121 N.C. App. at 370, 465 S.E.2d 343 (cities); *Stephenson*, 136 N.C. App. at 448, 524 S.E.2d at 612 (towns). The Hospital Authority contends that the General Assembly "has continued to leave the definitional scope of Chapter 75 untouched," despite the "many times since 1985" that it has amended Chapter 75, thereby "demonstrating its acquiescence to and acceptance of *Sperry* and its progeny," citing *Wells v. Consolidated Judicial Retirement System of North Carolina*, 354 N.C. 313, 319, 553 S.E.2d 877, 881 (2001) (stating that, "[w]hen the legislature chooses not to amend a statutory provision that has been interpreted in a specific way, we assume it is satisfied with the administrative interpretation"). Moreover, the Hospital Authority notes that this Court has "declined review in at least five cases that rely [on] or expound on *Sperry's* original holding," so that "principles of *stare decisis* and a need to ensure uniform application of the law" "counsel *Sperry's* continued application,"

citing *Bacon v. Lee*, 353 N.C. 696, 712, 549 S.E.2d 840, 851–52 (2001), and *McGill v. Town of Lumberton*, 218 N.C. 586, 591, 11 S.E.2d 873, 876 (1940).

As to plaintiffs' argument that the general statutory definition of "person" set forth in N.C.G.S. § 12-3(6) should govern in this case, the Hospital Authority asserts that, not only did plaintiffs fail to cite this statute before the trial court, they have "persistently omit[ted] the critical final words" of that statute, which state that the general definition shall apply "unless context clearly shows to the contrary." In the Hospital Authority's view, "the language and structure of Chapter 75 show that it was not intended to apply to the State and local government entities, and thus 'context clearly shows otherwise' from Section 12-3(6)." The Hospital Authority contends that the definition of "person" set forth in N.C.G.S. § 12-3(6) "was only ever intended to serve as a general, default rule that should not be applied where [the] context shows the Legislature intended a different meaning." Furthermore, the Hospital Authority argues that "applying Section 12-3(6)'s definition of 'person' to Chapter 75 would necessarily mean the statute applies to all 'bodies politic and corporate'—which includes the State itself," given that "Section 12-3(6) does not provide any basis to distinguish between the State and local governmental bodies when applying the phrase 'bodies politic and corporate.'" As a result, "adopting [p]laintiffs' argument would necessarily mean that Chapter 75 also applies to the State itself, not just quasi-municipal entities like the Hospital Authority," "a conclusion [which would] directly contravene[] the rule that '[n]ormally, general

statutes do not apply to the State unless the State is specifically mentioned therein,' " quoting *Davidson County v. City of High Point*, 85 N.C. App. 26, 37, 354 S.E.2d 280, 286, *modified and aff'd*, 321 N.C. 252, 362 S.E.2d 553 (1987).

In addition, the Hospital Authority notes that, "when the General Assembly has wanted to apply certain provisions of Chapter 75 to municipalities, it has expressly included them," as it did in N.C.G.S. § 75-39 (prohibiting municipalities from conditioning the provision of water and sewer services on the purchase of electricity or other municipal utilities) and N.C.G.S. § 75-61(9) (adopting a separate definition of the term "person," specific to the Identity Theft Protection Act, that specifically includes a "government" and "governmental subdivision"), and that "[t]here would be no need to expressly include municipalities and governmental subdivisions in these provisions if they were already 'persons' governed under Chapter 75 through the application of Section 12-3(6)," citing *AH N.C. Owner LLC v. N.C. Department of Health & Human Services*, 240 N.C. App. 92, 111, 771 S.E.2d 537, 548–49 (2015). Finally, the Hospital Authority argues that "the unfair trade practice and antitrust provisions of Chapter 75 make clear that they are intended to apply to 'practice[s] by those *engaged in business for profit*,' " quoting *F. Ray Moore Oil*, 80 N.C. App. at 142, 341 S.E.2d at 374, and that "[t]his emphasis on businesses engaged in traditional commercial activities for profit plainly excludes governmental entities."

In spite of plaintiffs' assertion that *Badin Shores* and the cases upon which it relies are only applicable to the unfair and deceptive trade practices portions of

Chapter 75, and not to the antitrust provisions that also appear in Chapter 75, the Hospital Authority contends that "[p]laintiffs cannot offer any valid reason" for interpreting the relevant statutes in this manner. On the contrary, the Hospital Authority argues that "*Sperry, Badin Shores,* and the other cases interpreting [N.C.G.S. §] 75-16 have consistently made clear that they apply with equal force to claims under the State's antitrust statutes,"—"a point the [trial court] confirmed" in its order in this case—and that "either the statute as a whole applies to these entities or it does not."

For a variety of reasons, the Hospital Authority disputes the validity of plaintiffs' contention that their claims would survive in the event that the Court elected to utilize concepts drawn from federal antitrust jurisprudence in determining the scope of Chapter 75. As an initial matter, the Hospital Authority asserts that, "far from being inconsistent, somehow, with federal law," "Congress . . . made the same determination that *Badin Shores* and its predecessors found in Chapter 75" by enacting the Local Government Antitrust Act of 1984, 15 U.S.C. § 34, *et seq.*, which provides that "local governmental entities . . . are exempt from monetary damages under federal antitrust law," with "local governments" being defined so as to include school districts, sanitary districts, "or any other special function governmental unit," quoting 15 U.S.C. § 34. The Hospital Authority notes that a federal court recently held explicitly that the Hospital Authority "was just such a local government, exempt from money damages under the federal antitrust laws," *see Benitez v. Charlotte-*

*Mecklenburg Hospital Authority*, 2019 WL 1028018, \*5 (W.D.N.C. 2019) (stating that "[the Hospital Authority] is a special governmental unit under the [Local Government Antitrust Act]" and that "the [Local Government Antitrust Act] shields [the Hospital Authority] from antitrust claims for monetary damages").

In addition, the Hospital Authority argues that plaintiffs are "indirect purchasers," being "two or more steps down the distribution chain," and that federal law prohibits "indirect purchasers" from "bring[ing] antitrust claims for any purpose and against any entity," citing *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S. Ct. 2061, 52 L. Ed. 2d 707 (1977). The Hospital Authority points out that, in response to the Hospital Authority's certiorari petition requesting this Court to review the right of indirect purchasers to sue pursuant to Chapter 75, "[p]laintiffs urged this Court *not* to 'graft' federal doctrines regarding antitrust standing onto Chapter 75" given that doing so "would have resulted in dismissal of their claims." In the Hospital Authority's view, plaintiffs "effectively take the position that federal law should be adopted where it only benefits [plaintiffs], and otherwise must be ignored," an approach that the Hospital Authority characterizes as "both unprincipled and disingenuous."

In view of the fact that N.C.G.S. § 75-16 was enacted a year before Congress enacted its counterpart, which appears as Section 4 of the Clayton Act, the Hospital Authority asserts that plaintiffs' contention that the General Assembly intended to incorporate the provisions of federal antitrust law into Chapter 75 as of the date of

its enactment is "nonsensical" given that the equivalent federal legislation "did not yet even exist." Moreover, the Hospital Authority argues that, "even assuming that the General Assembly intended to incorporate federal law that did not yet exist when it adopted [N.C.G.S. §] 75-16, the understanding at that time was that local governments were *not* subject to the antitrust laws," with it being "another sixty years . . . before the [Supreme Court] held that political subdivisions were subject to federal antitrust laws in certain circumstances," citing *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S. Ct. 1123, 55 L. Ed. 2d 364 (1978), and *City of Boulder*, 455 U.S. 40, 102 S. Ct. 835, 70 L. Ed. 2d 810. The Hospital Authority notes that these decisions resulted in the passage of "the [Local Government Antitrust Act] just two years later," with the Fourth Circuit having recognized in *Sandcrest Outpatient Services, P.A. v. Cumberland County Hospital System, Inc.*, 853 F.2d 1139, 1142 (4th Cir. 1988), that the enactment of the Local Government Antitrust Act was "a response to the filing of 'an increasing number of antitrust suits, and threatened suits,'" quoting H.R. Rep. No. 965, 98th Cong., 2d Sess. 2, *reprinted in* 1984 U.S. Code Cong. & Admin. News 4602, 4603, as a result of the holdings in *City of Lafayette* and *City of Boulder*, which the Fourth Circuit determined "could undermine a local government's ability to govern in the public interest," quoting *id*.

Next, the Hospital Authority argues that, contrary to plaintiffs' assertions, "[n]othing [about our decision in *Madison Cablevision*] . . . amounts to a determination that [N.C.G.S. §] 75-16 was meant to apply to local governments," so

that "*Madison Cablevision* does not govern" plaintiffs' Chapter 75 claims.  Instead, the Hospital Authority asserts that the Court made clear in *Madison Cablevision* that it "did not have to reach [the] question" of whether N.C.G.S. § 75-16 applied to cities "in order to dispose of the case" given that "the Court was able to decide it based on a much narrower (and simpler) proposition that it would make little sense for the General Assembly to authorize an action in one statute only to make it illegal under another."  Moreover, despite plaintiffs' reliance upon our decision in *N.C. Steel*, the Hospital Authority contends that that decision actually "cuts against [plaintiffs]" given the fact that "none of the defendants in *N.C. Steel* [were] even . . . governmental entit[ies]" and the fact that we "expressly rejected arguments that *Madison Cablevision* adopted an analysis akin to the state action immunity doctrine under federal antitrust law" in that case.  According to the Hospital Authority, "*Madison Cablevision* and *N.C. Steel* merely confirm that this Court has refused to adopt" "[p]laintiffs' bid to graft the federal state action doctrine onto Chapter 75," with "no reported cases in this State ha[ving] ever held that [N.C.G.S. §] 75-16 applies to governmental entities."

Finally, the Hospital Authority asserts that the federal state action immunity doctrine is not applicable to plaintiffs' Chapter 75 claims.  Instead, the Hospital Authority argues that "[t]he state action immunity doctrine as developed under federal antitrust law is rooted in principles of federalism and is 'premised on the assumption that Congress, in enacting the Sherman Act, did not intend to

compromise the States' ability to regulate their domestic commerce,'" quoting *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 56, 105 S. Ct. 1721, 1726, 85 L. Ed. 2d 36, 44 (1985), and "ha[d] no bearing on whether the General Assembly intended to subject local governments to claims for treble damages when it enacted [N.C.G.S. §] 75-16." The Hospital Authority also asserts that plaintiffs' contention that a "majority" of our sister states have adopted the state action immunity test is "incorrect." In addition to the five states listed by plaintiffs as having rejected the opportunity to adopt the state action immunity test into state law, the Hospital Authority lists four other states which have reached the same result and states that "there are at least four additional states in which courts construed their states' antitrust laws to be inapplicable to municipal corporations irrespective of the state action immunity doctrine." Moreover, even though plaintiffs have argued that numerous states had adopted the state action immunity doctrine, the Hospital Authority notes that, "[o]nce properly analyzed, there are sixteen states that follow the federal state action immunity construction for their antitrust laws"; "however, thirteen of those sixteen states do so as the result of specific statutory enactments unlike Chapter 75, not as the result of judicial adoption of this doctrine," and that there are, "in fact, only three states in which courts have taken the path urged on this Court by [plaintiffs]."

The Hospital Authority urges that this Court refrain from adopting the state action doctrine on the grounds that "it would be subjecting political subdivisions . . .

to a raft of liability under all sections of Chapter 75," pointing out that, "[a]ccording to Senate Judiciary Committee Reports, in the year and half between the time *City of Boulder* was decided and the [Local Government Antitrust Act] was passed, there were 'more than one hundred Federal antitrust suits seeking treble damages [filed] against'" local government entities, quoting S. Rep. No. 98th Cong., 2d Sess. 2 (1984), leading to the enactment of the Local Government Antitrust Act, which was intended to "allow local governments to go about their daily functions without paralyzing fear of antitrust lawsuits," quoting *Sandcrest*, 853 F.2d at 1142. The Hospital Authority adds that, "[i]n North Carolina, this [impact] would only be exacerbated by the fact that [N.C.G.S. §] 75-16 applies as well to unfair trade practice claims under [N.C.G.S. §] 75-1.1," violations of which are "claim[ed] in most every complaint based on commercial or consumer transaction[s] in North Carolina," quoting Matthew W. Sawchak and Kip D. Nelson, *Defining Unfairness in "Unfair Trade Practices,"* 90 N.C. L. Rev. 2033, 2034 (2012) (quotation and citation omitted). As a result, for all of these reasons, the Hospital Authority asks that we affirm the trial court's decision to grant its motion for judgment on the pleadings with respect to plaintiffs' Chapter 75 claims and to dismiss those claims with prejudice.

We agree with the trial court that, as a quasi-municipal corporation, the Hospital Authority is not a "person, firm, or corporation" for purposes of N.C.G.S. § 75-16. To begin with, plaintiffs' suggestion that the definition of "person" set forth in N.C.G.S. § 12-3(6) includes bodies politic and corporate, and for that reason, covers

the Hospital Authority in light of the fact that the Hospital Authorities Act specifically defines a hospital authority as "a public body and a body corporate and politic," N.C.G.S. § 131E-16(14), and that fact that the Hospital Authority's Certificate of Incorporation refers to it as a public body and a body corporate and politic, ignores the fact that N.C.G.S. § 12-3(6) also expressly states that this definition applies "unless the context clearly shows to the contrary." We are persuaded that the context here "clearly shows to the contrary" given that the Hospital Authority is acting in its delegated legislative function and not in a private fashion of any sort, particularly in light of our decision in *O'Neal v. Jennette*, 190 N.C. 96, 100–01, 129 S.E. 184, 186 (1925), holding that counties—which we know not to be "persons"—are also "bod[ies] politic and corporate." We find further support for this conclusion in *Student Bar Ass'n Board of Governors v. Byrd*, 293 N.C. 594, 60, 239 S.E.2d 415, 420 (1977) (holding that "the term 'body politic' connotes a body acting as a government; i.e., exercising powers which pertain exclusively to a government, as distinguished from those possessed also by a private individual or a private association"); *Smith v. School Trustees*, 141 N.C. 143, 150, 53 S.E. 524, 527 (1906) (holding that "the words 'political', 'municipal', and 'public' are used interchangeably" to describe "municipal corporations"); and *Sides v. Cabarrus Memorial Hospital, Inc.*, 287 N.C. 14, 18, 213 S.E. 2d 297, 300 (1975) (holding that, where a county possessed the authority to levy a special tax to operate and maintain a hospital which was created by legislative act as a "body corporate" and to substantially control that

hospital through the actions of the county commission, the hospital was an agency of the county). Furthermore, we note that the term "person" as used throughout Chapter 131E is defined as "an individual, trust, estate, partnership, or corporation including associations, joint-stock companies, and insurance companies," N.C.G.S. § 131E-1(2), none of which clearly encompass the Hospital Authority.

Plaintiffs' attempts to equate the Hospital Authority to a corporation subject to liability under Chapter 75 do not strike us as persuasive given that plaintiffs have made no genuine effort to distinguish a quasi-municipal corporation from any other sort of corporation, including an ordinary business corporation. In our view, the two entities have significant differences. N.C.G.S. § 131E-16(9) defines "corporation" as "a corporation *for profit* or having a capital stock which is created and organized under Chapter 55 of the General Statutes or any other general or special act of this State, or a foreign corporation which has procured a certificate of authority to transact business in this State pursuant to Article 10 of Chapter 55 of the General Statutes" (emphasis added). The record reflects, on the other hand, that the Hospital Authority is a registered *non*-profit organization. Simply put, the Hospital Authority does not appear to us to be a "corporation" as defined in N.C.G.S. § 131E-16(9).

As we have previously held, quasi-municipal corporations are created "to serve a particular government purpose," with the General Assembly having "giv[en] to these specially created agencies [certain] powers and call[ed] upon them to perform such functions as the Legislature may deem best." *Greensboro-High Point Airport*

*Authority v. Johnson*, 226 N.C. 1, 9–10, 36 S.E.2d 803, 809 (1946). Quasi-municipal corporations are "commonly used in [North Carolina] and other states to perform ancillary functions in government more easily and perfectly by devoting to them, because of their character, special personnel, skill and care." *Id*. at 9, 36 S.E.2d at 809. In such instances, "for purposes of government and for the benefit and service of the public, the [S]tate delegates portions of its sovereignty, to be exercised within particular portions of its territory, or for certain well-defined public purposes." *Gentry v. Town of Hot Springs*, 227 N.C. 665, 667, 44 S.E.2d 85, 86 (1947).

As the record clearly reflects, the Hospital Authority was created in accordance with N.C.G.S. § 131E-17(a) when the Charlotte city council adopted a resolution in which it "[found] that the public health and welfare, including the health and welfare of persons of low income in the City and said surrounding area, require the construction, maintenance, or operation of public hospital facilities for the inhabitants thereof." At that point, the mayor of Charlotte appointed eighteen individuals to serve as commissioners of the Hospital Authority pursuant to N.C.G.S. §§ 131E-17(b), -18, with the mayor having maintained the authority to remove commissioners "for inefficiency, neglect of duty, or misconduct in office" in accordance with N.C.G.S. § 131E-22. The Hospital Authority possesses the authority to acquire real property by eminent domain pursuant to N.C.G.S. § 131E-24 and to issue revenue bonds under the Local Government Revenue Bond Act pursuant to N.C.G.S. § 131E-26. The Hospital Authority is subject to annual audits by the mayor or the

chairman of the county commission pursuant to N.C.G.S. § 131E-29; to the Public Records Law, *see Jackson*, 238 N.C. App. at 352, 768 S.E.2d at 24; and to regulation by the Local Government Commission, *see* N.C.G.S. §§ 131E-21(f), -26, -32(c). In sum, the Hospital Authority was clearly created by the City of Charlotte, pursuant to statute, to provide public healthcare facilities for the benefit of the municipality's inhabitants. We are satisfied that the Hospital Authority is a quasi-municipal corporation, rather than a for-profit corporation coming within the purview of N.C.G.S. § 75-16.

As a result, we have no hesitation in concluding that the trial court correctly determined that the Hospital Authority, as a quasi-municipal corporation, is not subject to liability under Chapter 75. First, we do not find our holding in *Madison Cablevision* to be germane in resolving this issue given that, as the trial court noted, the General Assembly specifically authorized the conduct at issue in that case, which makes it different than the circumstances that are before us in this case. The General Assembly's silence with respect to this issue does not end our analysis; instead, it simply means that our analysis cannot be as straightforward as it was in *Madison Cablevision*.

For that reason, we turn to the Court of Appeals' decision in *Badin Shores*, in which that Court concluded that "regardless of whether a sanitary district is entitled to sovereign immunity, as a quasi-municipal corporation it cannot be sued for unfair and deceptive trade practices." *Badin Shores*, 257 N.C. App. at 560, 811 S.E.2d at

210. The trial court interpreted *Badin Shores* as standing for the proposition that all quasi-municipal corporations are exempt from liability under Chapter 75, noting that "[n]othing in the *Badin Shores* opinion appears to limit its holding to the factual scenario presented in that case" and that, "while *Badin Shores* involved an unfair and deceptive trade practices claim", its "holding encompasses all provisions of Chapter 75." As we previously discussed, quasi-municipal corporations are agencies which have been specially created by the General Assembly, *Greensboro-High Point Airport Authority*, 226 N.C. at 9–10, 36 S.E.2d at 809, by means of a legislative delegation of authority, to carry out the governmental purpose of providing a service to the benefit of the public, *Gentry*, 227 N.C. at 667, 44 S.E.2d at 86, which the legislature is not as well positioned to carry out itself. In this sense, quasi-municipal corporations are an extension of the government that have been created to more efficiently and effectively manage the provision of necessary services to the public. Although quasi-municipal corporations are not subject to all of the requirements applicable to other governmental entities, it is clear that their essential function is, at its core, the governmental provision of services. For that reason, just as *Rea Construction* and *Stephenson* held that cities and towns are governmental entities that are exempt from suit under Chapter 75, we conclude that the same is true of a hospital authority which is jointly operated by a city and a county and, indeed, that

all quasi-municipal corporations are exempt from suit under Chapter 75.[6] As a result,

we affirm the trial court's decision to dismiss plaintiffs' Chapter 75 claims.

## C. Article I, Section 34 Claim

In challenging the trial court's decision to deny its request for entry of

judgment on the pleadings with respect to plaintiffs' monopolization claim, the

Hospital Authority begins by contending that "the history and interpretation of the

Anti-Monopoly Clause reveals that it applies only when competition is eliminated,"

rather than when "government actions reduce competition, or have an adverse effect

on competition."[7]  The Hospital Authority points out that N.C. Const. art. I, § 34, "was

initially adopted as part of the State's first Constitution in 1776, and thus predates

the federal Sherman Act and the state antitrust laws embodied in Chapter 75 by more

than a century," citing N.C. Const. of 1776 Declaration of Rights, Art. XXIII; John V.

Orth and Paul M. Newby, The North Carolina State Constitution 90–91 (2d ed. 2013)

(Orth and Newby); and Stephen Calabresi, *Monopolies and the Constitution: A*

*History of Crony Capitalism*, 36 Harv. J.L. & Pub. Pol'y 984, 1073 (2012).  For that

reason, the Hospital Authority argues that "[t]he Anti-Monopoly Clause . . . is not

---

[6] In light of this determination, we need not determine whether the Hospital Authority is entitled to the protections of the state action doctrine as it is known in federal antitrust law.

[7] The Hospital Authority also asserts that, "by bringing an Anti-Monopoly Clause claim, [p]laintiffs concede the Hospital Authority is a governmental entity," despite plaintiffs contentions for the purposes of Chapter 75 that the Hospital Authority was a private actor or "nominally public."  According to the Hospital Authority, plaintiffs were not entitled to assert their monopolization claim if the Hospital Authority was not, in fact, "a unit of government."

meant to be the constitutional embodiment of federal and State antitrust statutes." "Instead," the Hospital Authority contends, "the clause was intended to prevent historical practices under which 'English monarchs had used grants of monopolies to reward their political favorites,'" citing Orth and Newby at 90–91, and *McRee v. Wilmington & Raleigh Rail Road Co.*, 47 N.C. 186 (1855). The Hospital Authority asserts that, "[w]hile today the word 'monopoly' is generally used to refer to the private accumulation of economic power," "[t]he original meaning of the word 'monopoly' was *an exclusive grant of power from the government*—in the form of a 'license' or 'patent'—to work in a particular trade or to sell a specific good," quoting Calabresi, *Monopolies and the Constitution: A History of Crony Capitalism*, 36 Harv. J.L. & Pub. Pol'y at 984 (emphasis added), "which had theretofore been a matter of common right," quoting *State v. Harris*, 216 N.C. 746, 761, 6 S.E.2d 854, 864 (1940). In the Hospital Authority's view, the "North Carolina courts have consistently adhered to this established, historical definition of 'monopoly' when applying the Anti-Monopoly Clause," citing *Rockford-Cohen Group, LLC v. N.C. Department of Insurance*, 230 N.C. App. 317, 749 S.E.2d 469 (2013) (holding that N.C. Const. art. I, § 34, prohibits the General Assembly from granting a single, named entity the exclusive right to train bail bondsmen); *Thrift v. Board of Commissioners*, 122 N.C. 31, 30 S.E. 349 (1898) (holding that N.C. Const. art. I, § 34, prohibits a municipality from granting an individual company the exclusive right to construct and maintain water and sewer systems within its corporate limits); and *McRee*, 47 N.C. 191

(holding that N.C. Const. art. I, § 34, prohibits the Governor from granting individuals the exclusive right to construct and operate bridges over a stream), while simultaneously having "upheld government actions that stop short of granting an exclusive franchise or control over a particular market," citing *Madison Cablevision*, 325 N.C. at 654, 386 S.E.2d at 211 (holding that, since "Morganton ha[d] not declared or established itself as the 'exclusive' supplier of cable television to its citizens," it had not violated N.C. Const. art. I, § 34, given that it "ha[d] not foreclosed . . . the possibility that franchises might be granted to other applicants"), or laws and regulations that "do not grant license holders an *exclusive* monopoly or otherwise eliminate competition," citing *State v. Sasseen*, 206 N.C. 644, 175 S.E. 142, 144 (1934); *Capital Associated Industries, Inc. v. Stein*, 922 F.3d 198, 212 (4th Cir. 2019); and *In re DeLancy*, 67 N.C. App. 647, 654, 313 S.E.2d 880, 884 (1984). The Hospital Authority contends that "the fundamental goal when interpreting the State Constitution is 'to give effect to the intent of the framers of the organic law and of the people adopting it,'" quoting *Stephenson*, 355 N.C. at 370, 562 S.E.2d at 389, with due consideration being given to the "history of the questioned provision and its antecedents, the conditions that existed prior to its enactment, and the purposes sought to be accomplished by its promulgation," quoting *id*. at 370–71, 562 S.E.2d at 389.

The Hospital Authority asserts that the *American Motors* case is "the most pertinent case to the issues at bar," particularly given that "[t]he facts here are

strikingly similar to those in *American Motors*," with *American Motors* having demonstrated that "the mere fact that competition had been 'restrained' was not enough to establish a constitutional violation, so long as competition had not been 'eliminated.' " The Hospital Authority notes that, in *American Motors*, while this Court recognized that North Carolina's Anti-Monopoly Clause was similar to a Georgia constitutional provision that had been used to invalidate auto-dealer statutes in that state, the Georgia provision prohibited the legislature from approving "any contract or agreement which may have the effect of defeating or *lessening* competition, or *encouraging* a monopoly," leading this Court to conclude that "the scope [of the Georgia provision] seem[ed] considerably more far-reaching into the area of commerce than our anti-monopoly provision." *American Motors*, 311 N.C. at 321, 317 S.E.2d at 359 (emphasis added).

The Hospital Authority asserts that the trial court "relied on an erroneous reading of *American Motors* to conclude that a 'monopoly' may exist under the Anti-Monopoly Clause, even though the alleged monopolist controls less than the entire market and 'some continued yet reduced competition' remains," resulting in the "commi[ssion of] a number of fundamental errors." In light of our conclusion in *American Motors* that competition which is not "as full and free" as it would be in the absence of governmental restraint upon the granting of additional dealerships within a given market area "is by no means eliminated" and that "[m]ore than a mere adverse effect on competition must arise before a restraint of trade becomes

monopolistic," 311 N.C. at 317, 317 S.E.2d at 356, the Hospital Authority asserts that the trial court's decision in this case to allow plaintiffs' monopolization claim to proceed, despite the fact that plaintiffs had merely alleged "a restriction on commerce" by the Hospital Authority, "stands directly at odds with the Court's reasoning in *American Motors*," particularly given that "the facts showing continued competition are even greater in this case than in *American Motors*" since plaintiffs "have affirmatively alleged [here] that there are six competitors *in the same market*."

In addition, the Hospital Authority contends that the trial court "focused on only a part of the Court's definition of 'monopoly' in *American Motors* without considering all of its elements." Although this Court enumerated four elements in defining the term "monopoly" in *American Motors*—"(1) control of so large a portion of the market of a certain commodity that (2) competition is stifled, (3) freedom of commerce is restricted, and (4) the monopolist controls prices," 311 N.C. at 316, 317 S.E.2d at 356—the Hospital Authority argues that the trial court "[f]ocus[ed] on only the first three elements" in deciding this case, each of "which deal with restriction of commerce, but not the control of prices indicative of a monopoly," and thereby erroneously concluding that "[p]laintiffs had stated a claim even though they have not alleged any facts to support the crucial fourth element in the *American Motors* definition" and even though the trial court "did not conduct any analysis to determine whether [p]laintiffs had alleged" facts to support the fourth element.

In the Hospital Authority's view, "[t]he ability to control prices lies at the heart of the 'public harm' that the Anti-Monopoly Clause is intended to prevent"; is "the critical element that distinguishes a monopoly from a firm with just some measure of 'market power,'" citing *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 480, 112 S. Ct. 2072, 2090, 119 L. Ed. 2d 265, 293 (1992) (holding that monopoly power requires "something greater than market power"); and is "key to determining whether a plaintiff has stated a claim at all, no matter what definition of 'monopoly' the Court adopts." Even so, the Hospital Authority argues that "[p]laintiffs conspicuously stop short of alleging any facts that would show the Hospital Authority controls prices for hospital services in Charlotte or that it has the power to exclude competitors," having simply argued, instead, that the Hospital Authority's market power enabled it to "*negotiate* high prices" and "*negotiate* contracts with health insurers that *restrain competition*."[8] Furthermore, the Hospital

---

[8] In its reply brief, the Hospital Authority states that it "has *not* argued that a state actor must eliminate each and every competitor or control 100% of the market before an Anti-Monopoly Clause violation occurs," and that, instead, "it is clear after *American Motors* that government actions which merely reduce, but do not eliminate, competition do not cause a violation," citing 311 N.C. at 317, 317 S.E.2d at 356, and that "governmental actions . . . must create or lead to the creation of a monopoly." According to the Hospital Authority, while an alleged monopolist need not hold one-hundred percent of the relevant market, the fifty percent share alleged in the complaint in this case is clearly insufficient. *See United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir. 1945) (stating that a ninety percent control over the aluminum market "is enough to constitute a monopoly" but that "it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three per cent is not"); U.S. Dep't of Justice, Competition and Monopoly: Single-Firm Conduct under Section 2 of the Sherman Act, Chapt. 2, n.23 (2008) (stating that "lower courts generally require a minimum market share of between 70% and 80%" to establish monopoly power for the purpose of antitrust statutes); *Exxon Corp. v. Berwick Bay Real Estate Partners*, 748 F.2d 937, 940 (5th Cir. 1984) (*per curiam*) (stating that "monopolization is rarely found when the

Authority argues that "alleging 'high prices,' or even 'supracompetitve prices,' is not enough to establish monopoly power," citing a number of decisions from certain federal circuit courts of appeal and from the Middle District of North Carolina.

In addition, the Hospital Authority argues that, in concluding that plaintiffs' allegations that "outside-market competitors 'would not prevent a hypothetical monopolist provider of acute inpatient hospital services located in Charlotte from profitably imposing small but significant price increases over a sustained period of time,' " the trial court "mistakenly relied on allegations in the complaints regarding the 'hypothetical monopolist test' as if they were factual allegations about the Hospital Authority itself." In the Hospital Authority's view, the "hypothetical monopolist test" is merely "a thought experiment used to define the boundaries of an economic market—not an analysis of actual market conditions or facts concerning the Hospital Authority," so that plaintiffs' allegations concerning this subject "ha[ve] nothing to do with the Hospital Authority."

---

defendant's share of the relevant market is below 70%"); *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1250 (11th Cir. 2002) (holding that a "market share at or less than 50% is inadequate as a matter of law to constitute monopoly power"); *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1411 (7th Cir. 1995) (stating that "[f]ifty percent is below any accepted benchmark for inferring monopoly power from market share"). In other words, the Hospital Authority asserts that, "[w]hile monopoly power certainly carries with it market power, market power does not create a monopoly"; thus, "a plaintiff must allege *facts* evidencing not just market power, but monopoly power in order to state a monopoly claim under State [law]," citing a number of federal district court decisions—a showing that the Hospital Authority asserts that plaintiffs simply did not make.

Finally, the Hospital Authority argues that the trial court "ignor[ed] [this] Court's admonition in *American Motors* that the Anti-Monopoly Clause was intended to apply only to 'horizonal' restraints of competition," citing 311 N.C. at 318, 317 S.E.2d at 357, which the Hospital Authority describes as "agreements among competitors which eliminate competition," "rather than the 'vertical' restraints challenged in this case," with vertical restraints being defined as "restraints imposed by agreement between firms at different levels of distribution," quoting *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2284, 201 L. Ed. 2d 678, 690 (2018) (quotations and citation omitted). In the Hospital Authority's view, "[t]here is good reason to distinguish vertical and horizontal restraints and limit the reach of the Anti-Monopoly Clause to horizontal restraints" given that "vertical restraints, such as those at issue in this case, 'can often have procompetitive effects,'" quoting *Valuepest.com of Charlotte, Inc. v. Bayer Corp.*, 561 F.3d 282, 287 (2009); are "presumptively lawful," citing *American Express Co.*, 138 S. Ct. at 2284, 201 L. Ed. 2d at 678; and "do not automatically result in the elimination of competition, the establishment of a monopoly, or the control of pricing." Instead, the Hospital Authority contends that vertical restraints can "facilitate the arrangements that lead hospitals to offer insurance companies discounts in the first place" and "protect patient choice" by ensuring that "all in-network hospitals have an equal chance to compete for insurers' patients" and that "insurance companies are not able to put their thumb on the scale by requiring [ ] patients to see the insurance company's

preferred provider in order to get the full benefit of the insurance they purchased." The Hospital Authority notes that horizontal restraints "are treated much more critically, as they are more likely to involve the type of 'naked restraints' the law views as inherently anticompetitive, such as price-fixing or market allocation arrangements among competitors to divide markets," citing *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 127 S. Ct. 2705, 168 L. Ed. 2d 623 (2007). By "ignoring" this distinction, the Hospital Authority contends that the trial court "replaced a bright-line rule . . . with a much more amorphous inquiry that will require [c]ourts to second-guess the reasonableness of every government action that arguably reduces, but does not eliminate, competition," contrary to our decision in *American Motors*.

The Hospital Authority cautions that, if the trial court's decision is allowed to stand, it would have "sweeping effects," with plaintiffs being able to "invoke the Anti-Monopoly Clause to challenge not just exclusive, government-sponsored franchises and monopolies, but *any* governmental action that restrains trade in any way." The Hospital Authority states that "[i]t is hard to overstate the change such a ruling would work in the law, or the extent to which it would hamper governmental conduct," "call[ing] into the question the legitimacy of the government's participation in markets for transportation, airports, hospitals, ports, water and sewer systems, construction, cablevision, and education" and leaving "open[ ] to challenge virtually all regulations governing private commercial activity." Ultimately, in the Hospital

Authority's opinion, the trial court's interpretation of the Anti-Monopoly Clause "would have a paralyzing effect on [government's] ability to effectuate important state policies," quoting *Madison Cablevision*, 325 N.C. at 657, 386 S.E.2d at 213, given that, "if an adverse effect on competition were, in and of itself, enough to render a state statute invalid, the States' power to engage in economic regulation would be effectively destroyed," quoting *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 133, 98 S. Ct. 2207, 2218, 57 L. Ed. 2d 91, 105 (1978). In light of the fact that "the government's economic actions and commercial regulations are reviewed under the forgiving 'rational-basis test,' " citing *Tinsley v. City of Charlotte*, 228 N.C. App. 744, 751, 747 S.E.2d 145, 150 (2013), the Hospital Authority asks that we reverse the portion of the trial court's order dealing with plaintiffs' Anti-Monopoly Clause claim and direct the Court to enter judgment on the pleadings in favor of the Hospital Authority with respect to this issue.

In seeking to persuade us to uphold the trial court's decision with respect to the monopolization claim, plaintiffs begin by contending that the trial court correctly concluded that competition need not be "eliminated" to sustain a such a claim. According to plaintiffs, the Hospital Authority used "isolated language" from our opinion in *American Motors* to support its point, ultimately "ignoring the holding [of that case] itself." Plaintiffs direct our attention to an excerpt from *American Motors* in which we stated that "[a] monopoly results from ownership or control of so large a portion of the market for a certain commodity that competition is stifled, freedom of

commerce is restricted, and control of prices ensues," "denot[ing] an organization or entity so magnified that it suppresses competition and acquires a dominance in the market," with the result being a "public harm through the control of prices of a given commodity." 311 N.C. at 315–16, 317 S.E.2d at 355. According to plaintiffs, we "reduced this definition" to the four elements to which the Hospital Authority referred in its argument and, based upon an analysis of the relevant facts, proceeded to conclude that the Commissioner of Motor Vehicles did not violate N.C. Const. art. I, § 34, by revoking a Jeep dealership's franchise on the basis that: (1) there was already another Jeep dealership in that county, so that the market would not support two Jeep dealerships; and (2) there were other Jeep dealerships within a reasonable range of the affected geographic area.

In addition, plaintiffs assert that the trial court correctly noted that *American Motors* was decided on "a full factual record and not on a motion for judgment on the pleadings," with the trial court having cited to a decision from the Eastern District of North Carolina, *Jetstream Aero Services, Inc. v. New Hanover County*, 672 F. Supp. 879, 885 (E.D.N.C. 1987) (denying the defendant's motion for judgment on the pleadings on the grounds that, "assuming [the] plaintiff can prove its allegations at trial, . . . a jury could find that [the] defendants' activities constitute a restraint of trade resulting in a monopoly"), in support of this aspect of its reasoning. Plaintiffs also argue that the trial court "correctly distinguished this case from *American Motors* on the facts" in light of its recognition that, in *American Motors*, the affected

consumers could "easily" reach other, neighboring Jeep dealerships and other four-wheel drive vehicles, while, in this case, "[a]cute inpatient hospital services outside of the Charlotte area are not a reasonable substitute for such services within the Charlotte area," with "the lack of *reasonable* substitutes" being "important to monopolization claims."

Furthermore, plaintiffs contend that the trial court's decision was "consistent with *Madison Cablevision*" since the municipality at issue in that case had "expressly left open the possibility that other capable companies could" compete, rendering that decision consistent with the "longheld principle that merely by entering the market the state does not, without more, give rise to a [N.C. Const. art. I, § 34,] claim by a private competitor," citing 325 N.C. at 654, 386 S.E.2d at 211–12, and asserting that, otherwise, *Madison Cablevision* "is simply inapposite to [p]laintiffs' [N.C. Const. art. I, § 34,] claim" given that plaintiffs "are not challenging, facially, the ability of a local government to establish a hospital authority" and given that this case does not involve a situation in which a "competitor has failed to meet legal requirements to compete in the market."

Moreover, plaintiffs claim that the Hospital Authority "ignores or mischaracterizes a host of decisions that reveal a broader prohibition" than that provided for in response to the actions of the English monarchs and "effectively wants the Court to overrule a century of jurisprudence and return the State of North Carolina civil rights to some imagined scope in 1776" despite the absence of any

support for this position. In plaintiffs' view, the approach advocated by the Hospital Authority conflicts with this Court's recognition of the importance of our fundamental legal principles, citing *Thrift*, 122 N.C. at 37, 30 S.E. at 351 (stating that "common law maxims and definitions . . . must be construed by us in the light of changed conditions"). In addition, plaintiffs assert that "the history of [N.C. Const. art. I, § 34,] jurisprudence shows it has been regularly applied to 'abuses' unknown to King George," citing *In re Certificate of Need for Aston Park Hospital, Inc.*, 282 N.C. 542, 551, 193 S.E.2d 729, 735–36 (1973) (holding that the Medical Care Commission's decision to "den[y] Aston Park the right to construct and operate its proposed hospital except upon the issuance to it of a certificate of need" amounts to the creation of "a monopoly in the existing hospitals contrary to the provisions of [N.C. Const. art. I, § 34,]" and makes "a grant to them of exclusive privileges forbidden by [N.C. Const. art. I, § 32]");[9] *Roller v. Allen*, 245 N.C. 516, 525, 96 S.E.2d 851, 859 (1957) (striking down a State scheme for the licensing of tile contracts on the grounds that "no substantial public interest is shown to be involved or adversely affected," so that "regulation is not justified"); and *Harris*, 216 N.C. 746, 762, 6 S.E.2d 854, 864 (1940) (striking down a State licensing scheme for dry cleaners which was of "little . . .

---

[9] The Hospital Authority correctly notes that, after our decision in *Aston Park*, the Court of Appeals held in *Hope – a Women's Cancer Center, P.A. v. State*, 203 N.C. App. 593, 607, 693 S.E.2d 673, 683 (2010), that certificate of need laws are constitutional. In light of that fact, the Hospital Authority asserts that *Aston Park* "has no continuing validity" and that, even if it did, it is otherwise distinguishable from the facts of this case. In light of our agreement that the facts at issue in this case are materially different from those at issue in *Aston Park*, we will refrain from commenting on its "continuing validity" in this opinion.

importance" other than to give "interested members of the group . . . control [over] admission to the trade"). Although the Hospital Authority cited to several local-ordinance cases to support its position, plaintiffs contend that those cases "stand for the proposition that the state may not privilege one competitor or some competitors over others, regardless of the fact that competition has not been 'eliminated,'" and that none of those cases involved a situation in which a single member of a given profession was allowed to monopolize the relevant trade, citing *Sasseen*, 206 N.C. at 644, 175 S.E. at 142; *Capital Associated Industries*, 922 F.3d 198; and *In re DeLancy*, 67 N.C. App. at 654, 313 S.E.2d at 885.

Plaintiffs also argue assert that their monopolization claim is consistent with the "original purposes" of the Anti-Monopoly Clause. Plaintiffs assert that "the right to compete, and the attendant right of North Carolinians to prices set by free competition," is precisely the "fundamental principle" protected by N.C. Const. art. I, § 34. According to plaintiffs, "there has never been a historical consensus . . . that unlawful monopolization requires the complete elimination of competition" and that "even the earliest reported common-law case on monopoly, in 1599, confirms" that proposition, citing *Davenant v. Hurdis* (1599) 72 Eng. Rep. 769; Moore 576 (K.B.). Moreover, plaintiffs suggest that "North Carolina has elected a path of robust antitrust enforcement," "being one of two states with a constitutional prohibition on monopolies at the founding" and having "enacted a treble-damages remedy . . . even more comprehensive" than the one found in the federal Sherman Act "when one

considers that North Carolina has extended the remedy to all consumers, including indirect purchasers."

According to plaintiffs, the allegations set out in their third amended complaint "repeatedly and in detail" alleged that the Hospital Authority possessed "market power [which] allowed it to control prices," effectively satisfying the fourth element of the test for the presence of a monopoly enunciated in *American Motors*, and that the trial court "acknowledged those allegations," having "block quoted two paragraphs" from plaintiffs' third amended complaint which "discussed the ways that [the Hospital Authority's] power affects prices" in denying the Hospital Authority's motion for judgment on the pleadings with respect to this issue. Plaintiffs suggest that, while the Hospital Authority "hangs its argument" on the fact that plaintiffs alleged that the Hospital Authority's market power "enabled it to *negotiate* high prices," "[t]he Hospital Authority may not cherry-pick one word out of a complaint and then ask the Court to draw inferences about that word in its favor" given that "[p]laintiffs clearly alleged that [the Hospital Authority] has amassed market power that is large enough to allow it to control prices."

According to plaintiffs, the "price-control prong of *American Motors* follows from the test for monopoly power under the federal Sherman Act" given that *American Motors* relied upon *State v. Atlantic Ice & Coal Co.*, 210 N.C. 742, 188 S.E. 412 (1936), in which plaintiffs assert that we decided "not . . . to be moored strictly to arcane definitions of monopolies" and, instead, "looked to Black's Law Dictionary and

a Massachusetts case," *Commonwealth v. Dyer*, 243 Mass. 472, 486, 138 N.E. 296, 303 (1923) (stating that, "[i]n the modern and wider sense monopoly denotes a combination, organization or entity so extensive and unified that its tendency is to suppress competition, to acquire a dominance in the market and to secure the power to control prices to the public harm with respect to any commodity which people are under a practical compulsion to buy"), in defining what a monopoly is. With this "more flexible foundation in place," plaintiffs assert that "*Atlantic Ice* proceeded to apply federal antitrust precedent," such as *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S. Ct. 502, 55 L. Ed. 619 (1911), and that decisions by the United States Supreme Court have consistently held that "the power to control prices or exclude competition may be inferred from, among other evidence, evidence of the ability to profitably raise prices substantially above the competitive level for a significant period of time," citing *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 27 n.46, 104 S. Ct. 1551, 1566 n.46, 80 L. Ed. 2d 2, 22 n.46 (1984) (holding that "market power exists whenever prices can be raised above the levels that would be charged in a competitive market"); *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001); and *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995). In plaintiffs' view, the question of whether the Hospital Authority "in fact has market power sufficient to meet *American Motors'* requirements of control of a portion of the

market large enough to stifle competition, restrict commerce, and control prices [is a] question[ ] properly left to the jury."[10]

Finally, plaintiffs suggest that the Anti-Monopoly Clause applies to vertical restraints as well as horizontal restraints and assert that the Hospital Authority's position to the contrary represents "a fundamental misreading of *American Motors*." According to plaintiffs, the Hospital Authority "ignores" the fact that the language that it relied upon from *American Motors* "address[ed] the petitioner's *facial* challenge to the dealer protection statute" in that case, making it "not even relevant conceptually," while, in this case, plaintiffs "challenge the specific restraints imposed on competition by [the Hospital Authority]," a fact that renders the language upon which the Hospital Authority relies beside the point. In addition, plaintiffs suggest that the Hospital Authority's "argument that a monopoly claim must involve horizontal restraints" "cannot be reconciled" with its argument that the Anti-Monopoly Clause "was understood only to prevent the State from granting or creating

---

[10] In addition, plaintiffs argue that the Hospital Authority waived the right to argue that plaintiffs failed to plead the "control of prices" element given that the Hospital Authority never set out the elements of the test contained within *American Motors* before the trial court and cannot, for that reason, assert for the first time on appeal that plaintiffs failed to satisfy the fourth element. The Hospital Authority responds that it "clearly argued below that [p]laintiffs had failed to allege sufficient facts to establish a monopoly," that it did not advocate the application of the *American Motors* test, and that it could not, for that reason, "have known, prospectively, that the [trial court] would fail to fully apply it." In light of the fact that the Hospital Authority contended in the memorandum of law that it submitted in support of its motion for judgment on the pleadings that "[p]laintiffs have not alleged sufficient facts to support such a claim, and, indeed, have alleged facts in their [t]hird [a]mended [c]omplaint that establish just the opposite," we are satisfied that the Hospital Authority properly preserved this argument for purposes of appellate review.

exclusive franchises of monopolies" given that "horizontal restraints, by definition, contemplate other market actors." Plaintiffs also note that "this case does not involve the type of intra-brand restraint that this Court approved in *American Motors*" since the "intent and effect" underlying the Hospital Authority's anti-steering restrictions "[is] to protect [the Hospital Authority] from price competition from its horizontal, inter-brand competitors: other hospitals." As a result, for all of these reasons, plaintiffs request that we affirm the trial court's decision to allow plaintiffs to proceed with respect to their monopolization claim.

In resolving the issue that is before us as a result of the trial court's decision to allow plaintiffs' monopolization claim to survive the Hospital Authority's motion for judgment on the pleadings, we are guided by our prior decision in *American Motors*, in which we held that the Commissioner of Motor Vehicles did not violate N.C. Const. art. I, § 34, by allowing only one Jeep franchise to operate within a particular county in light of the fact that there were Jeep franchises in multiple adjoining counties. 311 N.C. at 317, 317 S.E.2d at 356. In reaching this conclusion, we stated that "[a] monopoly results from ownership or control of so large a portion of the market for a certain commodity that competition is stifled, freedom of commerce is restricted, and control of prices ensues"; that "[i]t denotes an organization or entity so magnified that it suppresses competition and acquires a dominance in the market"; and that "[t]he result is public harm through the control of prices of a given commodity." *Id.* at 315–16, 317 S.E.2d at 355. As a result, we

held that "[t]he distinctive characteristics of a monopoly are . . . (1) control of so large a portion of the market of a certain commodity that (2) competition is stifled, (3) freedom of commerce is restricted and (4) the monopolist controls prices." *Id.* at 316, 317 S.E.2d at 356. In other words, in "order to monopolize, one must control a consumer's access to new goods by being the *only* reasonably available source of those goods," with "a consumer [having to] be without reasonable recourse to elude the monopolizer's reach." *Id.* In addition, we concluded that, "[w]hile competition may not be as full and free as with multiple . . . Jeep franchises existing in the [same county], it [was] by no means eliminated," and that "[m]ore than a mere adverse effect on competition must arise before a restraint of trade becomes monopolistic." *Id.* at 317, 317 S.E.2d at 356. In reliance upon these fundamental principles, we turn to the application of the test enunciated in *American Motors* to the factual record that is before us in this case. At the conclusion of our analysis, we are unable to agree with the trial court's determination that plaintiffs adequately pleaded that the Hospital Authority controlled "so large a portion of the market" that it not only stifled competition and restricted freedom of commerce, but also controlled prices.

In spite of plaintiffs' insistence that the Hospital Authority possesses a "dominan[ce]" over the market and "excessive market power," plaintiffs explicitly alleged that the Hospital Authority possessed "an approximately fifty percent share of the relevant market." Although reviewing courts have not identified a fixed percentage market share that an entity must allegedly possess in a given market in

order to adequately allege a monopolization claim and although the absence of such a bright line test compels the conclusion that the relevant determination must be made on a case-by-case basis, we are satisfied that, when considered in its entirety, plaintiffs' third amended complaint does not sufficiently allege that the Hospital Authority had a monopoly in the relevant market.

In reaching this conclusion, we do not wish to be understood as holding that a monopolization claim cannot proceed unless all competition has been eliminated and do not understand our prior decision in *American Motors* to support the imposition of any such requirement. On the other hand, however, we agree with the Fourth Circuit and other jurisdictions that have been skeptical of monopoly claims that, like plaintiffs, assert that a monopoly exists when an entity, like the Hospital Authority, has a market share of fifty percent or less. *See, e.g., White Bag Co. v. International Paper Co.*, 579 F.2d 1384, 1387 (4th Cir. 1974) (citing *Hiland Dairy, Inc. v. Kroger Co.*, 402 F.2d 968, 974 n.6 (8th Cir. 1986) (stating that "when monopolization has been found the defendant controlled seventy to one hundred percent of the relevant market"). For that reason, in light of the market share disclosed by the third amended complaint, plaintiffs' monopolization claim cannot survive unless the other allegations in the third amended complaint show that the Hospital Authority has the ability to control prices in the Charlotte market in spite of the fact that it only has a fifty percent market share.

Instead of containing additional allegations that show the ability to control prices, however, the allegations contained in the third amended complaint cut the other way. For example, the third amended complaint alleges that other hospitals of significant size provide acute inpatient hospital services in the Charlotte area. In other words, unlike the situation at issue in *American Motors*, in which the only intrabrand competitors were located in different service areas, the allegations contained in the third amended complaint show that the Hospital Authority faces a material level of competition within the Charlotte area itself. Moreover, while the Hospital Authority allegedly used its market power "to insulate itself from competition" so as to charge "higher prices," such allegations are not tantamount to a showing that the Hospital Authority is able to effectively *control* prices in the relevant market. As a result, given that plaintiffs have alleged that the Hospital Authority has no more than a fifty percent share of the market for acute inpatient hospital services in the Charlotte area and that it faces sizeable competitors within that market and given that plaintiffs have failed to allege that the Hospital Authority has the ability to actually control prices in that market, we are not persuaded that the allegations contained in the third amended complaint suffice to show that the Hospital Authority possesses "so large a portion" of that market that it risks causing the sort of harm to the public that N.C. Const. art. I, § 34, is designed to prevent. As a result, we hold that the trial court erred by denying the Hospital Authority's motion for judgment on the pleadings with respect to plaintiffs' monopolization claim.

### III. Conclusion

Thus, for the reasons set forth above, we conclude that the trial court did not err by granting judgment on the pleadings in favor of the Hospital Authority with respect to plaintiffs' Chapter 75 restraint of trade and monopolization claims. On the other hand, however, we further conclude that the trial court did err by denying the Hospital Authority's motion for judgment on the pleadings with respect to plaintiffs' claim pursuant to N.C. Const. art. I, § 34. As a result, the challenged order is affirmed, in part, and reversed, in part.

AFFIRMED, IN PART; REVERSED, IN PART.